**MOTLEY et al. v. LAWRENCE et al.**
(No. 7546.)

(Court of Civil Appeals of Texas. San Antonio. April 17, 1926. Rehearing Denied May 12, 1926.)

1. Wills ⬅➡164(6)—Testimony as to proponent's conduct and statements in sickroom after will was made held properly excluded as immaterial on issue of undue influence, in absence of evidence that testatrix was in mental condition to hear and understand him, or intended to revoke will in his favor.

In will contest for undue influence, by proponent, testimony that he came into sickroom, seemingly under influence of drink, after will was made, and displayed pistol, saying that "some one had gotten some of his whisky, and this was the difference," *held* properly excluded as immaterial, in absence of evidence that testatrix was in mental condition to hear and understand him, or that she intended to revoke will in his favor.

2. Wills ⬅➡323 — Statements by proponent's attorney that Hebrew physician, testifying as to testatrix's mental capacity, had been taking dinner with contestant since suit was pending, and that Hebrews do not generally make such social visits with Gentiles, held improper and ground for reversal, as tending to discredit and destroy probative force of his testimony.

In will contest, statements in argument by proponent's attorney, that physician testifying for contestants, "a Hebrew, with all his family, have been out there taking dinner with named contestant since this suit has been pending," and that "Hebrews do not as a rule make such social visits with Gentiles," *held* improper and ground for reversal, as tending to discredit and destroy probative force of his testimony as to testatrix's mental capacity.

3. Trial ⬅➡133(1)—It is trial judge's duty to quickly protect witnesses from unnecessary abuse by, and court from contempt of, counsel by rebuking latter, or, if necessary, publishing for contempt (Rules 39, 41, for district and county courts).

It is trial judge's duty to act quickly to protect witnesses from unnecessary abuse by, and court from contempt of, counsel, by rebuking them, or, if necessary, punishing for contempt, especially in view of rules 39 and 41 for district and county courts.

Appeal from District Court, Dallas County; T. A. Work, Judge.

Proceeding by Joe Z. Lawrence and another to probate the will of Sallie Motley, deceased, contested by R. P. Motley and others. Judgment for proponents, and contestants appeal. Reversed and remanded.

Smith, Robertson & Robertson, O. F. Wencker, and Etheridge, McCormick & Bromberg, all of Dallas, for appellants.

Lively & Dougherty and Thompson, Knight, Baker & Harris, all of Dallas, for appellees.

COBBS, J. On February 21, 1922, there was filed for probate in the county court of Dallas county, Tex., by Joe Z. Lawrence, as proponent, an instrument which purported to be the last will and testament of Miss Sallie Motley. On March 4, 1922, R. P. Motley, Mollie Frances Motley Pointer, joined by her husband, George H. Pointer, Grover Cleveland Motley, Thomas Z. Motley, Edna Brown, joined by her husband, Joe Brown, Ben F. Motley, Edna Smith, S. D. Smith, Irma Smith, Will M. Motley, Charles F. Motley, Hugh R. Motley, and Delbert C. Motley, filed in said probate court their petition contesting the probate of said will, alleging want of testamentary capacity on the part of the decedent, and the exercise of undue influence over her by proponent Joe Z. Lawrence and Bedford Galloway, resulting in the making of said purported will, and praying that said purported will be adjudged void; that it be denied probate; and that it be held for naught; also praying for a permanent ad-

ministrator or the alternative that some suitable disinterested person be appointed administrator during the pendency of the contest.

The probate (county) court, on a hearing, found for proponents against the contestants and admitted said will to probate. An appeal was taken by appellants herein to the district court, where the issues were again tried with a jury upon instruction given to the jury applicable to the issues presented by both parties, and upon the return of the verdict of the jury favorable to appellees the trial court entered judgment in favor of proponents and against contestants.

This cause was submitted to the jury upon but two issues:

"Special issue No. 1: Did Sallie Motley at the time the paper herein propounded for probate was executed have testamentary capacity?

"Special issue No. 2: Did Joe Z. Lawrence and Bedford Galloway exercise such undue influence on Sallie Motley as caused her to execute the instrument herein propounded for probate?"

Issue No. 1 was answered in the affirmative and issue No. 2 was answered in the negative.

It is largely a fact case and involves but few, if any, difficult questions of law to be determined. At the time of writing the will Sallie Motley was a feeble old woman 'of about 60 years of age, at the point of death, having two physicians attending her and having a night and day nurse. During the writing of the will all the family was called to her bedside. Dr. A. F. Jones and Dr. S. M. Freedman, her only attending physicians, were present. Dr. Freedman was requested to write down what she said about the disposition of her property. As she was so feeble it became necessary for Dr. Jones to secure from her her whispered answers and tell Dr. Freedman, who could not hear her, and who wrote them down and read them back to her for confirmation, which was done in every instance. This proceeding was carried on in the very presence and hearing of all the family, who were standing and sitting near the bed side, and they heard and understood what was going on. Members of the family made inquiries or suggestions as to her property and its disposition, from time to time, all of which she seemed to understand and gave intelligent replies. Mrs. Emma Motley, wife of contestant R. P. Motley, during the time Sallie Motley was making the statement for the will, made the inquiry, loud enough to be heard by all present, including testatrix, "Do you suppose she knows what she is doing?" whereupon Miss Sallie Motley just turned her head, and said: "My mind is as clear as it ever was." After the will was read to her there were as many as two material mistakes corrected by her. In reply to a question by Dr. Freedman if she knew what she was doing, she replied that

she did. It is undisputed by all the witnesses that the first devise she made was to Joe Lawrence, without any suggestion from any one. There is some testimony to the effect that prior to making the will the testatrix had fear of Joe Lawrence, for she went to Dallas to consult a lawyer, Judge Smith, about making her will, but after remaining in his office several hours failed to see him, and requested Mrs. Emma Motley, who accompanied her, "Not to tell Joe." Mrs. Motley testified as follows:

"Aunt Sallie didn't say anything until after we went to bed. Mr. Motley and Joe and her began talking about dividing up these estates (Joe's and Will's). Joe Lawrence began cursing about these estates. I heard what he said. He called Mollie's name, and Sallie says, 'Joe, don't call Mollie's name; you will run Mollie off and I need her to stay at home with me.' And he says, 'God damn Mollie; I don't care if I do run her off. You can hire a damned negro.'

"I spent that night there with Aunt Sallie. I slept with her that night. After we went to bed she began crying, and said, 'Now, you see how I am treated.' She knew I had heard Joe talking, and she says, 'They are worrying me to death about making a will.' She said they had just been worrying her to death ever since Willie died about making a will. She had made practically that statement to me before. I had heard her say it to Mr. Motley when she was over there at our house along in the summer. I can't remember now what else she said to me that night."

The case is lacking in much direct testimony in words to show any undue influence operating on the mind of the testatrix towards making the disposition of her estate contrary to her wishes or intention.

[1] The first proposition challenges the ruling of the court in excluding testimony of Georgia Dupree that Joe Lawrence came in the sickroom after the execution of the will as follows:

"Q. Now, then, were you in the sickroom of Miss Motley about supper time on Monday evening or around supper time? A. Yes.

"Q. Did Joe Lawrence come in there? I'm talking about the sickroom now, did Joe Lawrence come in there in the sickroom, that was Monday evening after this will business? A. Yes.

"Q. What was his condition and what did he do and say? A. He seemed to be under the influence of drink, and he displayed a pistol of some kind, and said some one had gotten some of his whisky, and this was the difference.

"Q. Was he talking in a low or loud tone of voice? A. Moderate tone.

"Q. A moderate tone? Now, when he said, 'This was the difference,' to what was he referring? A. That the pistol would make the difference, I think.

"Q. You say he said some one had got his whisky. Did he say it just that way or some different sort of way? A. He said somebody, had got his whisky; something like that.

"Q. Miss Motley, the patient, was there? A. Yes.

"Q. In bed? A. Yes.

"Q. Was it loud enough for her to hear it, assuming she was ' conscious? A. If she had been conscious.

"Q. The time you have testified in answer to direct questions that Joe was intoxicated, the will had been written and prepared and signed before that time, hadn't it? A. Yes.

"Q. And the doctors were gone, weren't they? A. Yes.

"Q. Well, then, Joe was hunting his whisky? A. Yes.

"Q. He came through there and displayed a pistol, as you have said? A. Yes.

"Q. He didn't draw the pistol on anybody? A. No.

"Q. Never offered to shoot anybody? A. Well, I didn't see him offer to shoot any one.

"Q. Did you see Joe with the pistol after that? A. He came in the room twice.

"Q. He came in the room twice? A. Yes.

"Q. About how much time intervened between the two events? A. Oh, 30 minutes; something like that.

"Q. Thirty minutes or something in that neighborhood? A. Yes.

"Q. Did you make any appeal to his wife about the matter. Joe's wife? A. Well, I don't know anything I said to her, but I asked every one I saw to try to keep him out."

It was not testified that he was cursing boisterously. The objection made to the testimony was:

"That said testimony is immaterial, irrelevant, incompetent, highly inflammatory without being enlightening, prejudicial to the rights of other devisees under the will; that the act proposed to be proven is one of personal misconduct occurring after the making of the will and in no way connected with or related to making the will, and upon 'the further ground that there is not in the record sufficient evidence that the will of Sallie Motley was the result of the undue influence of Joe Lawrence,"

—which objections the court sustained. It was not shown or attempted to be shown that Miss Motley heard him or understood him. This occurred after the will was executed, and such excluded testimony could have influence only upon her in making the will, and, if admissible at all, could only be on the theory that she might have intended a revocation of the will, but through intimidation and fear was prevented. There is no fact, circumstance, or suggestion of any thought or intention upon the part of testatrix to do so; in fact, it was apparent at that time she did not have the power to do so.

It is well enough settled that, for the purpose of showing undue influence by subsequent misconduct as said by the court, it would be in "casting its shadow backward" as of material aid to show what went before. Beadle v. McCrabb et al. (Tex. Civ. App.) 199 S. W. 355.

It is very doubtful whether the testimony, if permitted to go before the jury, would have had any probative value. Leaving out of mind the pistol part of the testimony, practically the same facts were in evidence concerning Joe's conduct in the room while the will was being written. His conduct prior to and during the writing of the will, leaving out the pistol and substituting the whisky incident, was about the same, and the jury found against contestants, notwithstanding his presence in the sickroom was his intoxicated condition was truly reprehensible; and, indeed, in every public place where he was with the family or around or about the sick old lady he was under the influence of liquor, and was unreasonably loud and boisterous in his contact with others, and his very attitude and presence suggested intolerance and domination; and it may be assumed his conduct was most domineering prior to the execution of the will.

If he desired to influence the testatrix to make her will to his benefit, it is strange it was not done before this time, and that he did not secure the entire estate instead of a life interest in only a part of it. There is very little outside of inferences to show that he wanted her to make any will. Certainly he was not the one who directly suggested and brought about this meeting. He opposed sending for the doctor who wrote it, and it is not shown that it was dictated in one single part by him, while others did so. It may be that he had previously influenced the devise he got for life, but there is no such direct testimony.

The court committed no error in excluding the testimony of the misconduct of Joe Lawrence, for its admission would not have shown any attempt to influence the testatrix, who had made the will, and would not have shown any ill feeling or hostility toward the contestants, but conduct unbecoming a good man, and the utter disregard not only of others, but of his very sick kinsman, who was then on her deathbed, and who had remembered him in her will. To be material it must have been shown that she was in the mental condition at the time to have heard and understood him.

[2] In proposition 3 appellants assign as error the ruling of the trial court in not sustaining appellants' objection to appellees' argument in referring to Dr. Freedman as a Hebrew, as calculated to arouse racial and religious prejudice and intended to inflame the passions of the jury.

The bill of exceptions has this qualification of the judge thereon:

"Judge H. F. Lively, attorney for proponents, did not make the argument as set forth in this bill of exceptions, but made, in substance, the following statement and argument:

" 'I invite your attention to the evidence which shows that contestants' witness Dr. Freedman, a Hebrew, with all his family, have been out there taking dinner with R. P. Motley of Grand Prairie since this suit has been pending. Now you know Hebrews do not as a rule make such

social visits with Gentiles.' They just don't do it.'

"While no witness testified that Dr. Freedman was a Jew, Dr. Freedman appeared and testified in person before the jury, and it was apparent to all, including the jury, that he was a Jew.

"Counsel for contestants made no objection and took no exception to the foregoing argument."

We take the qualification of the judge for the bill instead of what counsel writes.

The testimony of the doctor in the main is supported by all the persons present. On the question of her mental capacity the testimony tends to support the theory that she knew what property she had and to whom she desired it to be given.

We think the learned counsel went too far in his argument in denouncing the witness as a Hebrew, and saying that—

"Hebrews do not as a rule make such social visits with Gentiles. They just don't do it."

Such language has been held to be of such prejudicial effect as to cause reversals of judgments.

[3] Rule 39 for the district and county courts provides:

"Arguments on the facts should be addressed to the jury, when one is impaneled in a case that is being tried under the supervision of the court. Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel. Mere personal criticism by counsel upon each other shall be avoided, and, when indulged in, shall be promptly corrected as a contempt of court."

And rule 41 reads thus:

"The court will not be required to wait for objections to be made when the rules as to arguments are violated; but, should they not be noticed and corrected by the court, opposing counsel may ask leave of the court to rise and present his point of objection. But the court shall protect counsel from any unnecessary interruption made on frivolous and unimportant grounds."

We copy these rules for the purpose, too, of emphasizing to the trial courts their duty to protect litigants and witnesses and parties who are forced against their will in court trials from unnecessary abuse at the hands of enthusiastic and too energetic counsel. There are many, yes, the great majority of trial judges, who control their courts and rebuke counsel who indulge in such practices, as the rules of court require, without waiting for opposite counsel to arise and stop the proceedings to present his objections. So it is the duty of a watchful trial judge to quickly act in such cases. In Garritty v. Rankin (Tex. Civ. App.) 55 S. W. 367, the remarks of counsel as to the parties being "Jews" were condemned as calculated to prejudice the minds of the jury. So in Busse v. White, 302 Mo. 672, 259 S. W. 458, remarks made by

counsel wherein plaintiffs were referred to as "Germans" were condemned. So, also, in Moss v. Sanger Bros., 75 Tex. 321, 12 S. W. 619, the language used in an appeal to prejudice intended to influence the jury was condemned. In that case the court said:

"It was the arraignment of a race not on trial. Causes ought to be tried in a court of justice upon the facts proved, and whether a party be Jew or Gentile, white or black, is a matter of indifference. The course pursued in this case was one that no court of justice ought for a moment to tolerate, and it certainly must be true that the judge who tried this cause did not fully understand the language of counsel or he would not have permitted it, would have rebuked it, and ought to have punished its author. * * * Parties ought not to be punished for misconduct of their counsel not sustained or influenced by them, but they must be held bound to relinquish a judgment where there is reasonable ground to believe that it may have been obtained through such means as were used in this case.

"The verdict may or may not have been influenced by the language, but it was calculated and intended doubtless to have an influence, and as the case stood, with a preponderance of evidence in favor of appellant on one of the vital issues in the case, we deem its use a sufficient ground to require a reversal of the judgment, and it will for this reason be reversed and the cause remanded."

The same ruling was applied in Trachtenberg v. Castillo (Tex. Civ. App.) 257 S. W. 657, wherein counsel referred to defendants as "the sweet-scented apple blossoms from Russia." Also see Solomon v. Stewart, 184 Mich. 506, 151 N. W. 716, Ann. Cas. 1917A, 942. Also see Hyman v. Kirt, 153 Mich. 113, 116 N. W. 536, where the reference made to plaintiff as a "Jew horse dealer" was condemned by the court. Also see Panteles v. San Arsht, 227 Ill. App. 488, where counsel referred to defendant as a Jew, etc., and it was condemned by the court. In Freeman v. Dempsey, 41 Ill. App. 554, the court said:

"We are impressed that the verdict was the result of a prejudice worked up against the appellant. It is in the record that he was denounced by the attorney for appellee, as 'A Jew, a Christ killer, a murderer of our Savior.' If the appellee is a Jew, on account of his birth, or parentage, it was not his fault, neither is it a disgrace, if, on account of his religion, it is not a cause of reproach. As to the other epithets applied to him, denunciatory as they are of the whole Jewish race, it is almost inconceivable that they should be either uttered or tolerated in the trial of a cause in a court of justice.

"No one, doubtless, would admit, on reflection, more readily than the attorney for appellee, the gross impropriety of their use, especially at such a place and on such an occasion. Judgment is reversed, and the cause remanded."

Also see K. C., M. & O. Ry. Co. v. Swift (Tex. Civ. App.) 204 S. W. 135; Western Indemnity Co. v. MacKechnie (Tex. Civ. App.) 214 S. W. 456; Kirby Lumber Co. v. Young-

blood (Tex. Civ. App.) 192 S. W. 1106; Stark v. Brown (Tex. Civ. App.) 193 S. W. 717; Anderson & Day v. Darsey (Tex. Civ. App.) 171 S. W. 1089; Colorado Canal Co. v. Sims (Tex. Civ. App.) 82 S. W. 531; Railway Co. v. Burton, 25 Tex. Civ. App. 63, 60 S. W. 316. In Home Life Insurance Co. v. Jordan (Tex. Civ. App.) 231 S. W. 802, though no objections were made to the argument, which appears only in the bill of exceptions, as here, the court said, among other things:

"It appears that counsel made the objectionable remarks with the knowledge of the court, without rebuke or effort to restrain him. The rules promulgated for the government of the district court declare that counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel, * * * and the court will not be required to wait for objections to be made where the rules as to arguments are violated. * * * By these rules the 'duty devolves affirmatively, first, upon counsel to confine his argument strictly to the evidence and to the argument of opposing counsel; second, upon the court, on its own motion, to confine counsel to this line of argument.'" Parker v. Miller (Tex. Com. App.) 268 S. W. 726.

We cannot say how far the reference to the doctor as a "Hebrew with all his family, have been out there taking dinner with R. P. Motley of Grand Prairie since this suit has been pending. Now you know Hebrews do not as a rule make such social visits with Gentiles. They just don't do it," may have influenced the jury.

The testimony as to the mental capacity of Sallie Motley, deceased, to make a valid will was testified to by Dr. Freedman as a medical expert. He said:

"In the course of my practice I have attended quite a good many patients, prior to my attendance there during the last illness of Aunt Sallie Motley, that were afflicted with different diseases. I have been doing a general practice, also surgery, and I have had occasion to observe other patients who were in a critical condition like Aunt Sallie Motley was, as I have described her condition on Monday at the time, this instrument was written up. From my practice since 1901, and from my knowledge of Aunt Sallie at that time, my examination of her, and my observation of her condition, in my opinion, at the time this purported will was being had, and at the time I took her hand and dragged it across this paper and made this cross mark, I would say that she did not have the mental capacity to comprehend and keep in mind the properties that she owned. From my experience of some 20-odd years, up to the time this purported instrument was made on February 6, 1922, from my knowledge of the condition of Aunt Sallie Motley, the patient, my observation of her, in my opinion, I do not think that she had mental capacity to comprehend, know, and keep in mind all of the objects of her bounty."

Dr. A. F. Jones, the other physician, testified:

"I was acquainted with Sallie Motley in her lifetime; she is dead. * * * The day this instrument was made I examined the patient, Miss Motley. I had occasion to observe her. In the preparation of this instrument and during the execution of the will I had occasion to observe her in making bequests. At the time of signing this instrument I considered her, judging from all the circumstances, of sound mind. It was my opinion that she was of sound mind at the time of making this instrument and at the time of signing it."

The testimony of the two doctors on the mental condition of the testatrix is in direct conflict, and could only be reconciled by the jury. But if their minds were influenced by the speech of counsel, they would have given but slight consideration to Dr. Freedman's testimony.

This was a fact case for the jury, which involved necessarily a finding as to her mental capacity to make a final disposition of her estate. There was much testimony, pro and con, and appellants were entitled at least to a fair trial by a jury, free from prejudice. Evenly balanced there was no testimony of any single witness in the case of more value than that of a learned physician, who had the opportunity to exercise his knowledge and experience of such matters and better to pronounce a correct judgment.

Can any one say that an inference, such as appellees' counsel desired the jury to draw, that, after this will was written, he, a Hebrew, a Jew, and his family began visiting Mr. Motley, an interested party in the estate, when Jews do not as a rule make such social visits with Gentiles, was intended to and did tend to discredit his testimony and destroy its probative force?

District courts are charged with a high duty in respect to trials before them. It is their duty to protect their courts from the contempt of counsel who flagrantly violate the rules of court, and, if necessary, to do so they have the full power to punish for contempt.

The time is ripe for the enforcement of law and order and due respect for constituted authority. Trials in courts must proceed in an orderly way and command respect, so that they shall mean something, not only to those litigating in the courts, but to mankind.

We cannot feel that appellants have had a fair trial, and, for that reason, and for the errors pointed out, the judgment of the trial court will be reversed, and the cause remanded for another trial.