**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**Roman P. GUERRERO, Appellee.**

**No. 04–88–00400–CV.**

Court of Appeals of Texas, San Antonio.

Sept. 19, 1990.

Rehearing Denied Dec. 12, 1990.

W. Wendell Hall, Xavier Rodriguez, Fulbright & Jaworski, San Antonio, for appellant.

Catherine M. Stone, Watkins & Brock, Timothy Patton, Pasqual & Pozza, San Antonio, for appellee.

Before CADENA, C.J., and PEEPLES and BIERY, JJ.

## OPINION

PEEPLES, Justice.

Appellee's motion for rehearing is denied. Our previous opinion is withdrawn and replaced by the following.

Texas Employers' Insurance Association (TEIA) appeals from a judgment rendered on a jury verdict awarding plaintiff Roman Guerrero worker's compensation benefits for total and permanent disability. TEIA's complaints fall into three categories: (1) sufficiency of the evidence, (2) submission of issues regarding the adequacy and timeliness of Guerrero's notice of injury and claim for compensation, and (3) jury argument. We reverse and remand for a new trial.

The evidence, considered favorably to the verdict, shows that on January 16, 1982, while working for TEIA's insured, H.G. Farms, Guerrero fell from his tractor, landing on his rear and injuring his tailbone. The employer sent him to Dr. Kimmel, who diagnosed a chipped coccyx. For three months Dr. Kimmel treated Guerrero and TEIA paid workers' compensation benefits and medical expenses. On April 15, 1982,

Guerrero returned to work, and he continued to work for H.G. Farms until the company closed in October 1984. On January 19, 1985—three years after the January 1982 injury—Guerrero saw Dr. Rios, who diagnosed a herniated lumbar disc and operated four months later.

## I. SUFFICIENCY OF THE EVIDENCE.

■ The jury found that Guerrero was injured on January 16, 1982 in the course of his employment for H.G. Farms, and that the injury caused total and permanent incapacity. TEIA challenges the legal and factual sufficiency of the evidence to support these findings. TEIA does not challenge the finding of total incapacity during the 30 months that Guerrero was fully employed at his original job, or the finding that his disability was total and permanent. It contends only that the evidence is legally and factually insufficient to link Guerrero's herniated disc to the January 1982 injury. We review TEIA's legal and factual sufficiency points under well-settled standards that need not be repeated here. *See Trenholm v. Ratcliff*, 646 S.W.2d 927, 931 (Tex. 1983); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Prior to his January 1982 fall from the tractor, Guerrero was free of back pain. After the incident, he complained to Dr. Kimmel in lay language of back pain, not coccyx pain. When he returned to work three months after the injury, he still suffered back pain, which still existed when he saw Dr. Rios three years later. According to Dr. Rios, Guerrero complained of radiating pain in January 1985. A CT scan and myelogram showed a herniated disc, which was consistent with Guerrero's history of falling from the tractor and landing on his rear. Dr. Kimmel's records for January 19, 1982 showed "chief complaint: back." He detected tenderness around the tailbone and a fractured coccyx at the tip. He found the lumbar spine normal and saw no evidence of a herniated disc. He opined that the fall could have weakened the disc, and that if there had been no intervening injury or trauma from 1982 to 1985, as Guerrero testified, it was possible that the 1982 injury had caused the herniated disc diagnosed in 1985. It is true that Dr. Rios admitted at two points that his opinions about causation were speculative, and that Guerrero made no complaint of back pain when he saw other doctors. But we conclude that the evidence, assessed under the appropriate standards, is both legally and factually sufficient.

## II. NOTICE OF INJURY AND CLAIM FOR COMPENSATION.

■ TEIA complains of the trial court's refusal to submit its tendered jury questions asking whether Guerrero gave his employer notice of injury within 30 days. TEIA does not dispute that Guerrero immediately told his employer he had injured himself, or that the employer promptly sent him to Dr. Kimmel for treatment. Furthermore, TEIA admitted in response to requests for admissions that Guerrero timely reported to the employer that he had sustained "an accidental injury while in the course of [his] employment." On this record, timely notice was conclusively established and no jury question was necessary.

On appeal TEIA argues that notice of an injury *to the disc* was required. But TEIA did not urge that distinction in the trial court, and therefore the contention has been waived. TEX.R.APP.P. 52(a).

■ TEIA also contends that the trial court should have submitted various questions concerning whether Guerrero complied with article 8307 § 4a's requirement that he file a worker's compensation claim within six months of the injury.[1] The jury found that Guerrero's supervisor assured him that a claim had been filed. Guerrero, who speaks no English and has little education, said he asked his supervisor to take

1. In 1983 the six-month period in section 4a was changed to one year.

care of the paperwork and was assured that it would be done. He relied on that assurance. The jury's finding of good cause is supported by the evidence, and Guerrero's failure to file a formal claim was therefore excused. *See Standard Fire Ins. Co. v. Morgan*, 745 S.W.2d 310, 311 (Tex.1987).

## III. JURY ARGUMENT.

■ TEIA complains that Guerrero's counsel made an appeal for ethnic unity in his closing jury argument. The record shows that eleven of the twelve jurors had Spanish surnames,[2] as did Guerrero, his trial attorney, and his treating doctor, Dr. Rios. The challenged argument reads as follows (emphasis added):

MR. BARRIENTOS (Guerrero's counsel):

I am tickled to death to be here and I will represent him and any man like him in Zavala, Maverick, Dimmit, Cameron, any county in the State of Texas any time.

Octavio Paz, a well-known author said one time, and I will quote him and I already translated it. He said, *"Things that unite us far exceed those things that divide us."*

You apply that to evidence. The things, the preponderance of the evidence, that unite in favor of Mr. Guerrero, far exceed those inconsistencies, the legal problems. He is not a perfect man, neither is his medical. But heck, he went back to work after he got cut, things of this nature. *The things that unite us, exceed those that divide us. There is a time to be united. Right now is a time to be united.*

An example is politics. We don't have to agree with all the candidates, with the same ones. *But by golly there comes a time when we have got to stick together as a community.* We have to stick together as a jury of peers of a man to pass judgment and help that person if he is entitled to [sic] under the evidence.

MR. KURTH (TEIA's counsel): Your Honor, this is getting a little inflammatory in asking the jury to take that position—

MR. BARRIENTOS: No, No. I didn't ask them, sir, I said, We. I think that is proper.

THE COURT: Well, you have got two minutes.

MR. BARRIENTOS: Thank you, your Honor. Because *if one is united, one has hope.* And with hope, one can live. He still has a lot of years to live. And it is all going to depend on you.

TEIA contends that this argument was a subtle but nonetheless real request for the jury to be united and on Guerrero's side for ethnic reasons. Guerrero's appellate counsel defends the argument by characterizing it as a request that the jury view Guerrero's case as more united by consistencies than divided by legal technicalities. Counsel's brief then concludes that there is nothing inflammatory or incurable about the argument. The quoted remarks were made three minutes before counsel finished his closing argument and the jury retired to deliberate.

Appeals to racial prejudice are of course prohibited. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex.1979); *Texas Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856 (1954). They are "universally condemned." *See* Annotation, *Statement by Counsel Relating to Race, Nationality, or Religion in Civil Action as Prejudicial*, 99 A.L.R.2d 1249, 1254 (1965). No one suggests that appeals to ethnic prejudice should be treated differently from racial ones.

We think the argument was a request for ethnic solidarity that cannot be plausibly explained away as a suggestion that the jury simply remember the things that "unite" Guerrero's case. Counsel said that the things that unite "us" exceed the things that divide "us," and then said, "There is a time to be united. Right now is

---

2. The twelfth was named Francisca Alday.

a time to be united." The argument did more than simply say, "In this case the evidence for Mr. Guerrero is united," which counsel now urges was his true meaning. Words such as "By golly, there comes a time when we have got to stick together as a community" cannot be excused as simply a declaration that Guerrero's case was more unified than divided. A realistic assessment of the argument in context leads to the inescapable conclusion that an appeal for ethnic unity was made. We cannot accept any suggestion that such ethnic pleas are permissible when they are dressed up and mingled with advice that the jury should follow the evidence. The argument was a forbidden ethnic plea. We must therefore decide whether it constitutes reversible error.

While most improper jury arguments can be cured by objection and instruction to disregard, appeals to racial prejudice are one of the exceptional kinds of argument that are considered incurable. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d at 840. As we read *Reese*, an appeal to racial prejudice—as opposed to the mere incidental mention of race [3]—constitutes reversible error even if no objection was made. While the court in 1954 in *Haywood* had evaluated a racial argument's harmful impact after a review of the entire record, *Reese* held in 1979 that such arguments are "exceptional," and unlike other arguments that require an objection and are curable by an instruction to disregard, they are *incurable and reversibly harmful*. In most situations, said the court, an instruction to disregard will cure the prejudice and make it harmless:

> In [an earlier case], this court noted the strength of the rule requiring timely *objection* to improper argument even prior to 1941 and wrote that the supreme court had gone to some length in holding that even strong appeals to prejudice *become harmless when a jury is instructed to disregard them*, "for which reason it is logical to require an objection and instruction."

*Id.* at 840 (emphasis added). But in rare instances—such as the injection of racial prejudice into the case—an instruction will not cure the harm:

> The injection of new and inflammatory matters into the case through argument has in exceptional instances been regarded as *incurable by an instruction. An appeal to racial prejudice falls into the category.* [Citation omitted]. The use in argument of the epithets, "liar," "fraud," "faker," "cheat," and "imposter" in disregard of objections that were made was *harmful.* [Citation omitted]. The unsupported charge of perjury was *incurable.* [Citation omitted]. *Those cases ... show that an affront to the court and the equality which it must portray will be dealt with harshly.*

*Id.* (emphasis added).

■ According to the dissent, "incurable" simply means "no objection necessary," and incurable arguments will not require reversal if the appellate court considers them harmless. Clearly an incurable argument does not require an objection, but to go further and hold that an argument can be incurable and yet harmless is a contradiction in terms. The dissent's view cannot be squared with the passage quoted above, in which the *Reese* court used the terms "incurable" and "harmful" almost interchangeably. Other language

---

**3.** The court in *Dayton Hudson Corp. v. Altus*, 715 S.W.2d 670, 676 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *cert. dism'd*, 481 U.S. 1073, 107 S.Ct. 2471, 96 L.Ed.2d 364 (1987), dealt with an incidental mention of race. There plaintiff's counsel referred to defense witnesses as "two black people." The majority opinion does not indicate the context in which the remark was made, but obviously the majority considered the remark to be an isolated, incidental remark and not an appeal to racial preju-

dice. Because defense counsel did not object, the majority held the complaint had been waived.

According to the dissent in *Altus*, the racial references pervaded the entire trial and were not merely incidental. Because the supreme court denied review, we conclude that it agreed with the majority's assessment of the record.

in *Reese* makes clear that "cure" refers to *harm* and not only to *preservation of error*, as the dissent urges. The *Reese* court said there are "rare instances of *incurable harm* from improper argument," *id.* at 839 (emphasis added), and a later passage refers to an argument that was considered "harmless and curable." *Id.* at 840. The portion of the *Reese* opinion that discusses how a court should assess harmfulness applies to the "unexceptional" mass of cases in which harm must be shown based on the entire record.

*Reese*'s equation of "incurable" with "harmful" is consistent with the supreme court's earlier statements that the notion of "cure" refers to removing the argument's *harmful effect.* The court said so at great length in *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex.1968) (emphasis added):

> Improper jury arguments are usually referred to as one of two types: "curable" or "incurable." A jury argument is *"curable"* when the *harmful effect* of the argument can be eliminated by a trial judge's instruction to the jury to disregard what they have just heard. The error is *"cured" and rendered harmless* by the instruction. On the other hand, an argument may be so inflammatory that its *harmfulness* could not be eliminated by an instruction to the jury to disregard it. The *prejudicial nature* of the argument is so acute that it is *"incurable."*

If the argument is of a "curable" nature, an objection to it must be promptly made and an instruction requested or the error is waived. But if the argument is "incurable," the failure to object does not result in a waiver....

We have concluded that the argument complained of was improper, but that its *prejudicial effect* was *curable* by an instruction to disregard.

Later cases have continued to equate the terms "incurable" and "harmful," holding that the evil that cannot be "cured" is the harmful, prejudicial nature of the argument. *See, e.g., Gannett Outdoor Co. v. Kubeczka*, 710 S.W.2d 79, 86 (Tex.App.—Houston [14th Dist.] 1986, no writ); *American Home Assur. Co. v. Coronado*, 628 S.W.2d 818, 823–24 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.); *Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682, 685 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.).[4] We hold that incurable does not mean simply that no objection need be made; it also means that the argument's harmfulness, its reversible impact, cannot be cured or corrected by an instruction.

It is true that the veiled and subtle ethnic references in this case are not nearly so explicit and brazen as those in *Texas Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856 (1954),[5] but we cannot affirm the judgment on that basis. "The statement, to be objectionable, may be indi-

---

**4.** *Ford Motor Co. v. Durrill*, 714 S.W.2d 329, 342 (Tex.App.—Corpus Christi 1986), *judgment vacated by agr.*, 754 S.W.2d 646 (Tex.1988), did not involve a racial or other incurable argument, and its suggestion that an argument can be incurable yet not harmful is inconsistent with *Reese, Otis Elevator, Kubeczka, Coronado,* and *Fisher,* and with the same court's earlier statement in *Hartford Acc. & Indem. Co. v. Thurmond*, 527 S.W.2d 180, 192 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.) (explaining curable and incurable in terms of whether the argument's harmful, prejudicial effect can be removed by an instruction to disregard).

**5.** In *Haywood* the defendant presented two black witnesses who had worked with the plaintiff at a garage after his on-the-job injury. They testified that he did not complain of injury while they worked with him. Addressing plaintiff's counsel's attack on the two witnesses, the court said:

> The particular part of the argument deemed by us to be most inflammatory is that in which it was implied that the Reynolds brothers were not to be believed because they were Negroes: " * * * why then didn't they bring the superintendent [of Shaw's garage] *or bring some white fellow that you could see and know was telling the truth?* * * * It looks to me like it would have been awful easy to have *brought some white fellows* that had their cars worked on *or somebody that you could believe.* Is that the way you would do it? That's common sense. I wouldn't fly a *couple of those yellow nigs in here and expect the jury to believe that kind of stuff."*

rect or implied, as well as direct or express...." Annotation, *Statement by Counsel Relating to Race, Nationality, or Religion in Civil Action as Prejudicial,* 99 A.L.R.2d 1249, 1254–55 (1965). The law should not stoop to evaluating subtle distinctions such as whether an argument was too crude and revolting, or on the other hand sufficiently slick and artful to pass muster. To permit the sophisticated ethnic plea while condemning those that are open and unabashed would simply reward counsel for ingenuity in packaging. Inevitably, lawyers representing their clients zealously within the bounds of the law would test the limits and fine-tune their arguments to avoid being too explicit. Courts would be asked to label some arguments permissible and uphold them with a wink when everyone knew that an ethnic appeal had been made. That course would demean the law and perhaps deepen the divisions from which society already suffers.

The *Reese* court condemned such appeals to prejudice as "exceptional" and as "an affront to the court and the equality which it must portray." Such arguments, the court said, "will be dealt with harshly." 584 S.W.2d at 840. We think there are compelling reasons for *Reese*'s harsh, incurable-error approach. When a racial or ethnic appeal is made, the dispute is no longer confined to the litigants; there has been an attack on the social glue that helps bind society together. *Reese* characterized it as an affront *to the court.* The offense is against society, and it makes no difference whether the victimized-litigant has shown harm. Lawyers have no right to undermine the ethnic harmony of society simply to win a lawsuit.

The dissent's reversible-error approach would do nothing to discourage the well-packaged ethnic argument. It would unwittingly permit lawyers to craft subtle ethnic arguments, thereby putting the burden on the opposing attorney to object and seek an instruction to disregard.[6] Because an instruction could cure the harm—and failure to seek an instruction would waive any error—the offending lawyer would have almost nothing to lose. Ethnic arguments would not cause reversal unless the victimized attorney made an objection, sought an instruction to disregard, and obtained an appellate ruling that the argument was reasonably calculated to cause and probably did cause rendition of an improper judgment. Presumably, under the dissent's view, the victimized attorney would also have to make a post-verdict record to establish the actual ethnic make-up of the jury in order to establish harm.

If we were to affirm the judgment before us, we would establish a precedent permitting calculated, subtle racial or ethnic arguments by all litigants in all types of cases—personal injury, family law, commercial—provided the arguments were properly dressed up and disguised. Such a decision would insulate appeals for "unity" when minority litigants found themselves in court before juries in other parts of this state. That is a real and frightening prospect in this nation of immigrants. All litigants—anglo, black, hispanic, native American, oriental, and all others, including governmental and business entities—should feel free to litigate their cases before juries in all 254 counties without facing state-of-the-art ethnic pleas in closing argument. Such arguments are forbidden, and it matters not whether counsel suggests—depending upon the venue—that the jury reward or penalize a litigant for belonging or not belonging to a racial or ethnic group. *Angelina Casualty Co. v. Ryan,* 282 S.W.2d 310, 313 (Tex.Civ.App.—Galveston 1955, writ ref'd n.r.e.); *Cooke–Teague Motor Co. v. Johnson,* 50 S.W.2d 399, 401 (Tex.Civ.App.—Fort Worth 1932, no writ); Annotation, *supra,* 99 A.L.R.2d at 1255 ("a

---

*Texas Employers' Ins. Ass'n v. Haywood,* 266 S.W.2d at 858 (ellipsis, brackets, and emphasis by the supreme court).

6. Although we do not rest our decision on the making of an objection, we note that TEIA's counsel made a partial objection to the argument but was interrupted and did not continue.

statement calculated to create bias *in favor of* a litigant may be as prejudicial as one calculated to create prejudice *against* him") (emphasis added).

The Texas courts have consistently condemned jury arguments based on grounds of race, ethnicity, religion, and national origin.[7] In the last twenty-five years such tactics have almost vanished, at least in the reported decisions. We think the scarcity of such arguments in recent years, and the consistent condemnation of them by our appellate courts, indicates that society considers them utterly beyond the pale. Recently adopted Canon 3A(9) of the Code of Judicial Conduct further demonstrates our legal system's commitment to prejudice-free trials:

A judge shall perform judicial duties without bias or prejudice. A judge shall

not, in the performance of judicial duties, manifest bias or prejudice by words or conduct and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so. *A judge shall require lawyers in proceedings before the court to refrain from manifesting, by words or conduct, bias or prejudice based on race, sex, religion or national origin against parties, counsel or others.*[8]

■ We hold that incurable reversible error occurs whenever any attorney suggests, either openly or with subtlety and finesse, that a jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity.[9] Because such a jury argument was made in the court below, we reverse the judgment and remand

---

7. During the last hundred years, the Texas appellate courts have almost uniformly condemned arguments that invoked prejudice based on race, ethnicity, religion, or national origin.

   Race has been an especially risky subject. *See, e.g., Texas Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856 (1954) (reversal required because plaintiff criticized defendant for calling two "yellow nigs" instead of white witnesses to testify); *Dallas Ry. & Terminal Co. v. Garner*, 63 S.W.2d 542 (Tex.Comm'n App.1933, judgment adopted) (condemning counsel's observation that jury didn't know whether deposition witness was Negro or Chinaman, but reversing judgment on other grounds); *Panhandle & S.F. Ry. v. Sedberry*, 46 S.W.2d 719, 722 (Tex.Civ.App.—Eastland 1932, no writ) (condemning argument that defendant forced plaintiff to work on crew that included Negroes and Mexicans).

   Equally forbidden are criticisms that litigants or witnesses are Jewish. *See Moss v. Sanger*, 75 Tex. 321, 12 S.W. 619 (1889) (reversing for argument that the suit was concocted by a Jew, a Dutchman, and a lawyer, including "the old he-Jew of all, who no doubt planned the whole thing. All Jews, or Dutch Jews, and that is worse."); *Texas Employers' Ins. Ass'n v. Jones*, 361 S.W.2d 725 (Tex.Civ.App.—Waco 1962, writ ref'd n.r.e.) (derogatory reference to witness as "that Jew" was an incurable "appeal to racial and religious prejudice in language clear and strong"); *Motley v. Lawrence*, 283 S.W. 699, 701–703 (Tex.Civ.App.—San Antonio 1926, writ dism'd) (condemning argument that something improper occurred when witness Dr. Freedman, "a Hebrew," had dinner with Gentile litigants; "Hebrews do not as a rule make such social visits with Gentiles. They just don't do it.").

   Arguments characterizing the case as a contest between an alien and an American have received similar condemnation. *See Penate v. Berry*, 348 S.W.2d 167 (Tex.Civ.App.—El Paso 1961, writ ref'd n.r.e.) (reversible error to argue that an alien "can't come into court and reach [his] hands into the pockets of an American citizen and take his property from him"); *Basanez v. Union Bus Lines*, 132 S.W.2d 432 (Tex.Civ. App.—San Antonio 1939, no writ) (reversing defense verdict because counsel stressed that plaintiff was not an American citizen and stated, "I don't know whether he waded that river or swam. But ... when you gentlemen bring in the verdict he will swim that river again.... I think he is all wet in this lawsuit.") *See also Trachtenberg v. Castillo*, 257 S.W. 657 (Tex.Civ. App.—El Paso 1923, writ dism'd) (condemning reference to defendants as "these birds from Russia" and "these sweet-scented apple blossoms from Russia").

8. Order of December 19, 1989, 779–80 S.W.2d XXX, effective December 19, 1989.

9. Our decision does not require a mistrial whenever a racial or ethnic argument is made. On the contrary, we think the better course would be to await the jury's verdict. If the offending party does not obtain a favorable verdict, a second trial might be avoided.

   Nor does our decision rest on the actual ethnic makeup of the jury. Guerrero's motion for rehearing argues that a Hispanic surname might be used by an anglo female who has married a Hispanic male and taken the name of a Hispanic male. That is true, just as it is also possible that in this case the twelfth juror, Francisca Alday, may have been a Hispanic who married an anglo male. But we do not rest our decision

the cause for a new trial. We stress that our holding does not encompass incidental references to the race of parties and witnesses; instead, we deal here with an intentional appeal for a verdict on the basis of ethnicity.

■ TEIA also complains that plaintiff's counsel argued that defense counsel had "lied" to the jury. Such an argument is clearly improper; *Reese* arguably placed the epithets "liar," "fraud," "faker," "cheat," and "imposter" in the same category of rare incurable arguments as appeals to racial prejudice. *See* 584 S.W.2d at 840. Because this case must be retried for other reasons, we simply call attention to the supreme court's strong and express disapproval of such terminology.

## IV. TRIAL COURT'S DUTY TO SUPPRESS IMPROPER JURY ARGUMENT.

■ We also take this opportunity to emphasize the responsibilities of trial judges when improper jury argument occurs. Under *Reese* many arguments are considered curable and harmless. But that does not mean that they are proper or that the trial court should permit them. *Reese* did not suggest in the slightest that *trial courts* should adopt a passive "anything goes" attitude toward improper jury argument. *Reese* simply outlined the reversible error burden that appellants face in the *appellate court* when they complain of jury argument.

Rule 269 commands courts to correct improper argument *sua sponte:*

Rule 269. Argument

\* \* \* \* \* \*

(e) Arguments on the facts should be addressed to the jury, when one is impaneled in a case that is being tried, under the supervision of the court. Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel. *Mere personal criticism by counsel upon each other shall be avoided, and when indulged in shall be promptly corrected as a contempt of court.*

(f) *Side-bar remarks, and remarks by counsel of one side, not addressed to the court,* while the counsel on the other side is examining a witness or arguing any question to the court, or addressing the jury, *will be rigidly repressed by the court.*

(g) *The court will not be required to wait for objections to be made when the rules as to arguments are violated;* but should they not be noticed and corrected by the court, opposing counsel may ask leave of the court to rise and present his point of objection. But the court shall protect counsel from any unnecessary interruption made on frivolous and unimportant grounds.

TEX.R.CIV.P. 269 (emphasis added). These portions of rule 269 have been the law in Texas since 1892 with no change in wording.[10]

Three years before the above-quoted rules were adopted, the supreme court underscored the duty of trial judges to police jury argument. In an 1889 case, in which counsel flagrantly criticized the adverse parties for being Jewish, the supreme court condemned the argument and reminded trial judges of their responsibilities in the strongest language:

Cases ought to be tried in a court of justice upon the facts proved; and whether a party be Jew or gentile, white or black, is a matter of indifference. *The course pursued in this case was one that no court of justice ought for a moment to tolerate; and it certainly*

---

on the actual ethnic heritage of the jurors or the other participants in the trial. The important thing is that the attorney who made the intentional ethnic appeal thought it would have an impact on the jury.·

**10.** *See* Rules 39–41, *Rules for the Courts of Texas,* 84 Tex. 695, 714–15, 19–20 S.W. v, xiv (adopted by order of the Supreme Court of Texas, October 8, 1892).

*must be true that the judge who tried this cause did not fully understand the language of counsel, or he would not have permitted it,—would have rebuked it, and ought to have punished its author.*

*Moss v. Sanger*, 75 Tex. 321, 12 S.W. 619, 620 (1889) (emphasis added).

In keeping with these rules, court decisions have consistently urged trial judges not to take a laissez-faire approach. We note the following words of a unanimous supreme court in 1954:

> We realize that in the course of a hotly contested trial lawyers are apt, even prone, to "pull off the gloves"; but lawyers are officers of the court and proper and ethical conduct requires that there be limitations on the extent to which counsel may go in the injection of prejudicial and inadmissible matters, whether by way of cross-examination of witnesses or by way of jury argument. When these limits are transgressed a trial ceases to be a test of right and wrong by standards of law in a court of justice and becomes a "catch-as-catch-can, no-holds-barred" spectacle not unlike a modern wrestling match. *It is not only the province but the duty of the trial judge, acting on his own volition if necessary, to prevent any such deterioration of judicial dignity.*

*Texas Employers' Ins. Ass'n v. Haywood*, 266 S.W.2d at 859–60 (emphasis added). In view of these authorities, it cannot be said that this decision imposes a new responsibility on trial judges. The trial court's duty to police jury argument *sua sponte* has existed in Texas for 100 years.

We wholeheartedly reaffirm the words of our own court in *Motley v. Lawrence*, 283 S.W. 699, 702–703 (Tex.Civ.App.—San Antonio 1926, writ dism'd):

> We copy these rules [the predecessors to present rule 269] for the purpose, too,

of emphasizing to the trial courts their duty to protect litigants and witnesses and parties who are forced against their will in court trials from unnecessary abuse at the hands of enthusiastic and too energetic counsel. There are many, yes, the great majority of trial judges, who control their courts and rebuke counsel who indulge in such practices, as the rules of court require, without waiting for opposite counsel to arise and stop the proceedings to present his objections. So it is the duty of a watchful trial judge to quickly act in such cases.

\* \* \* \* \* \*

District courts are charged with a high duty in respect to trials before them. It is their duty to protect their courts from the contempt of counsel who flagrantly violate the rules of court, and, if necessary, to do so they have the full power to punish for contempt.

The time is ripe for the enforcement of law and order and due respect for constituted authority. Trials in courts must proceed in an orderly way and command respect, so that they shall mean something, not only to those litigating in the courts, but to mankind.[11]

The judgment is reversed and the cause is remanded for a new trial.

BIERY, Justice, dissenting.

I respectfully dissent.

The court today has announced a significant expansion of a rule intended to deter improper jury argument. The majority's decision, however, conflicts with previous supreme court and court of appeals decisions and imposes an unworkable burden on the trial judges of this state.

While I agree with the social policy statements of the majority opinion and the cases

---

**11.** The viability of the quoted language from *Moss v. Sanger* and *Motley v. Lawrence* was not weakened by the *Reese* court's disapproval of pre–1941 cases concerning reversible error. *Reese* concerned *appellate* review and whether error is harmless or reversible; *Moss* and *Motley* concerned the duty of the trial judge and dealt with racial arguments, which *Reese* condemned as incurable. 584 S.W.2d at 840.

cited, I disagree with the majority's application of those cases to remarks which are subtle and ambiguous as opposed to overt. Trial judges have a long-standing responsibility to police closing arguments; however, they should not be required to retry a case if a subtle or ambiguous argument does not result in harmful error. The cases relied upon by the majority involved overt and egregious racial, ethnic or religious comments. In those cases, error was properly preserved by objection or the overt and egregious nature of the argument rendered it incurable and made an objection unnecessary to preserve error. *See Texas Employers' Ins. Ass'n v. Haywood,* 266 S.W.2d 856, 858–59 (Tex.1954) (Justice Calvert opines that an objection to a particularly inflammatory argument is not always necessary and then went on to say that the improper argument *was reasonably calculated to cause and probably did cause an improper verdict.*) (Emphasis added.) In the instant case, an incomplete objection was made, no instruction to disregard was requested, and no motion for mistrial was lodged. There is no opinion by the majority that the alleged improper argument in this case resulted in an improper verdict.

It is a rarity that limited judicial resources are used for retrials because of incurable jury arguments. Even strong appeals to prejudice become harmless when a jury is instructed to disregard them, for which reason it is logical to require an objection and instruction. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840 (Tex.1979); *Fowler v. Garcia,* 687 S.W.2d 517, 520 (Tex.App.—San Antonio 1985, no writ). A judgment should be reversed on the basis of improper argument only in rare instances. *See Texaco v. Pennzoil Co.,* 729 S.W.2d 768, 834–35 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *Smith v. Smith,* 720 S.W.2d 586, 592–94 (Tex.App.—Houston [1st Dist.] 1986, no writ).

In *Texas Sand Co. v. Donald L. Shield,* 381 S.W.2d 48 (Tex.1964), the supreme court said:

Other cases deal with the question of whether certain types of arguments are 'curable' or 'incurable.' *See Wade v. Texas Employers Ins. Ass'n,* 150 Tex. 557, 244 S.W.2d 197 (1951); *Houseman v. De Cuir,* 155 Tex. 127, 283 S.W.2d 732 (1955). However, regardless of the type or category in which an argument might fall, the true test is as laid down in *Texas Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856 (1954), the test that has been consistently followed by this Court since the adoption of Rules 434 and 503, *supra.* In the *Haywood* case we said:

> The true test is the degree of prejudice flowing from the argument—whether the argument, considered in its proper setting was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability *that it resulted in an improper verdict.* (Emphasis added.)

*Texas Sand Co.,* 381 S.W.2d at 58.

In *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835 (Tex.1979), the supreme court speaks of the history of the harmless error rule and, in that context, sets forth seven elements a complainant must prove in order to obtain a reversal for improper jury argument. *Id.* at 839. Among other things, the complainant must prove either that error was preserved by a proper objection (Element No. 3) or that no objection was necessary because an instruction would not have cured the error (Element No. 4). Finally, the supreme court says:

> (7) Importantly, a reversal must come from an evaluation of the *whole* case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, *the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings*

*and evidence.* (Emphasis added.) *Aultman v. Dallas Ry. & Term. Co.,* 152 Tex. 509, 260 S.W.2d 596 (1953).

*Standard Fire Ins. Co. v. Reese,* 584 S.W.2d at 840.

In *Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), the appellant complained of the appellee's closing argument in which it was asserted that appellee overtly and directly appealed to the passion and prejudice of the jury by referring to the appellee as a "God fearing Christian woman" and the appellant's employees as "two black people." *Id.* at 676. Notwithstanding the overt language of this argument, the Houston court of appeals, relying on *Standard Fire Ins. Co. v. Reese,* found that appellant never objected to these statements, and therefore, the issue was waived. *Id.* The supreme court denied a writ with the notation "no reversible error." The rule proposed by the majority in this case conflicts with the *Dayton Hudson* holding.

In *Greeson v. Texas & Pacific Ry Co.,* 310 S.W.2d 615 (Tex.Civ.App.—El Paso 1958, writ ref'd n.r.e.), the appellant raised numerous complaints concerning the closing argument of the appellees including references to witnesses as "colored boy," and "be he black or white." The El Paso Court of Appeals said:

> ... we have concluded that the cumulative effect of all the argument complained of, whether improper or not, *was not calculated to cause, and probably did not cause, the rendition of an improper judgment in the case.* (Emphasis added.)

*Id.* at 623.

The language from *Otis Elevator Co. v. Wood,* 436 S.W.2d 324 (Tex.1968) which is relied upon by the majority does not do away with the harmful/harmless analysis

required by the supreme court's holding in *Texas Sand Co.,* 381 S.W.2d 48 (Tex.1964). Rather, *Otis* simply stands for the proposition that if the argument is "curable," an objection must be made to preserve the error. *Otis* at 333. On the other hand, if the argument is "incurable," an objection need not be made to preserve the error. *Id.* Having found preserved error, the court then must make an analysis of whether the error was reversible under the standard of TEX.R.APP.P. 81(b)(1).

Turning to the challenged argument in the case before us, the threshold analysis is whether the argument is improper. The literary quote is followed by an application of the quote to the evidence in the case as seen by Guerrero's counsel. Next, counsel for Guerrero analogizes between the body politic and the body of a jury of peers of a man seeking a judgment *"if he is entitled to [sic] under the evidence."* (Emphasis added.) The use of hyperbole [1] and metaphors, as well as history, politics, literature or personal experience, is not only permissible but represents traditional tools of oral advocacy. *See Louisiana & Arkansas Railway v. Capps,* 766 S.W.2d 291, 296 (Tex.App.—Texarkana 1989, no writ); *Sheffield v. Lewis,* 287 S.W.2d 531, 539 (Tex. Civ.App.—Texarkana 1956, no writ).

Clearly, ethnicity is never mentioned in the argument. It is undisputed that the ethnic plea, if any, is subtle and, I believe, ambiguous at the very worst. We must make our decision based on the record before us. To conclude that the challenged portion of the argument is an improper plea for ethnic unity would require that we take into account cultural, political, and social history of the geographical area in which this case was tried which is not in the record before us.

If ethnicity is truly an issue [2] in this case, there is nothing in the record before us to show the ethnicity of the Spanish surnamed

---

1. For an extensive use of hyperbole in literature *see* Justice Pope's opinion in *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835 (Tex.1979).

2. The record reflects that Spanish surnamed witnesses, lawyers and investigators appeared on behalf of the plaintiff *and* the defendant, and participated as jurors.

people involved. *Lopez v. Foremost Paving Co., Inc.,* 699 S.W.2d 232, 235 (Tex. App.—San Antonio 1985), *rev'd on other grounds,* 709 S.W.2d 643 (Tex.1986). Spanish surnames, in and of themselves, do not prove a unity of ethnic purpose where considerable cultural differences exist among Cubans, Puerto Ricans, Mexicans, Nicaraguans, Salvadorans and others. *United States v. Duran de Amesquita,* 582 F.Supp. 1326, 1328 (S.D.Fla.1984).

I would hold under the state of this record that the appellant has not met its heavy burden of showing an improper argument.

Even if the argument were deemed to be inappropriate, we note that *Dayton Hudson Corp. v. Altus,* where overt references were made to "God fearing Christian woman" and "two blacks," is a recent case standing for the proposition that even overt racial arguments require an objection in order to preserve any error. Assuming for the sake of discussion that the argument was improper and that any error was properly preserved, I believe that *Standard Fire Ins. v. Reese, Texas Sand Co. v. Shield, Wade v. Texas Employers' Ins. Ass'n* and *Texas Employers' Ins. Ass'n v. Haywood* further require an analysis of whether the error was harmful or harmless. In the rare instance that improper unobjected-to jury argument is incurable, the complaining party has the additional burden to show the argument by its very nature, degree and extent constituted *harmful* error. *Ford Motor Co. v. Durrill,* 714 S.W.2d 329, 342 (Tex.App.—Corpus Christi 1986), *judgment vacated by agr.,* 754 S.W.2d 646 (Tex.1988). We judge by *degree* of the vice, not merely the subject matter of the argument. *Wade v. Texas Employers' Ins. Ass'n,* 150 Tex. 557, 244 S.W.2d 197, 201 (1951). (Emphasis added.)

Given our review of the record and findings on the sufficiency of the evidence, I question that any error was harmful and that a retrial in which the objectionable four sentences are excluded will produce a significantly different result. TEX.R. APP.P. 81(b)(1).

Rule 324(b)(5) of the Texas Rules of Civil Procedure provides that an appellant must raise the issue of incurable argument in a motion for new trial if the alleged incurable argument has not otherwise been ruled upon by the trial court. The appellant properly did this. Presumably, the reason for this rule is to give the trial judge an opportunity to reflect calmly, at the post-judgment stage, on whether alleged incurable argument (a) really was incurable and (b) constituted harm to the extent that a new trial would be required. In overruling the motion for new trial, the trial judge apparently believed that the alleged error did not result in the rendition of an improper judgment.

The true power and wisdom of the judicial branch of our government is vested primarily in the discretion and sense of fair play of the trial bench. It is extremely rare for our jurisprudence to impose a rule of automatic reversal which undermines the discretion vested in trial courts. In *Carson v. Amberson,* 148 S.W.2d 972 (Tex. Civ.App.—San Antonio 1941, writ dism'd judgmt cor.), we refused to presume that counsel's repeated references to the Greek racial and national origin of the decedent and the plaintiff's witnesses constituted reversible error. In so holding, we not only stressed the discretion vested in trial court when supervising the trial and ruling on a motion for new trial, but recognized the differences between the roles of the trial and the appellate courts:

> We realize, of course, that the impression of an argument received at the time of its delivery in the forum of the trial court may differ from that received by reading the cold record, and, for that reason, we must necessarily attach importance to the trial judge's action in overruling the motion for new trial. On the whole, upon the record presented here, we cannot say that the somewhat extravagant and rather disconnected statements of counsel in his argument constituted an appeal to racial prejudice.

*Id.* at 975.

In the case before us, we should attach importance to the fact that the judge who

was present at the trial, who listened to the arguments, who was able to analyze the voice inflections of counsel and the reactions of the individual jurors, and who was not ruling based on the "cold record," determined that the few seconds of alleged improper argument over the space of a three-day trial did not lead to an improper verdict.

When an argument is of an ambiguous nature such that it is susceptible to two meanings, one of which is harmless and one of which tends to be prejudicial, it is counsel's obligation to object and point out the prejudicial character of the argument. *See Thompson v. Clement*, 202 S.W.2d 341, 343 (Tex.Civ.App.—Galveston 1947, writ ref'd n.r.e.). Any objectionable connotation to which such an argument will reasonably lend itself will be held to be waived unless the prejudicial connotation is the only one the argument will reasonably bear. *Id.* Upon proper objection to an argument which is ambiguous or which could reasonably be construed as prejudicial or otherwise objectionable, it becomes the duty of the trial court, at that point, to instruct the jury not to consider that argument in its objectionable sense. *Id.*

If there is not an obligation on counsel to raise an objection, we shift the burden to the trial court to interject itself *sua sponte* throughout closing argument whenever the trial judge perceives some subtle or ambiguous argument which might be classified by an appellate court as an impermissible reference.

The deterrence sought by the majority of such subtle arguments can be achieved instead by counsels' awareness of a significant risk of losing a favorable verdict should the trial court or appellate court find that such arguments probably resulted in the rendition of an improper judgment.

The automatic reversal rule announced by the majority must be applied consistently throughout the 254 counties of Texas. Suppose, for example, that this case had been tried in Eastland County and that the author quoted was John Dickinson instead of Octavio Paz. Suppose further that the quotation used by counsel was from *The Liberty Song* [1768] by Dickinson: "Then join hand in hand, brave Americans all! By uniting we stand, By dividing we fall." Finally, suppose that the names of the parties, lawyers, witnesses, investigators, jurors and judge were names such as Walton, Key, Bailey, Johnson, Hart, Trout, Christian, Robinson, Owen, Bacon, Bush, Dickenson, Hughes, Vance, Cook and Parrish. Because of the facially apparent ethnic connection between the quoted author and the participants in the trial and because of the quotation concerning being "united," the rule announced by the majority would seem to require reversal and new trial irrespective of the substance of the case and whether or not the argument was calculated to cause and probably did cause an improper result.

I would hold that in order for subtly packaged and ambiguous remarks to result in a new trial or reversal, the error in closing argument must first be reviewed in the context of the totality of the trial pursuant to a harmful/harmless analysis.