*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

## MEMORANDUM OPINION

No. 04-08-00483-CV

**SEPCO TUBULARS**, Inc. and Padre Tubular, Inc.,
Appellants

v.

Jesse **ORTEGA** and Collinsworth Well Treating, Inc.,
Appellees

From the 79th Judicial District Court, Brooks County, Texas
Trial Court No. 05-10-13092-CV
Honorable Richard C. Terrell, Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Catherine Stone, Chief Justice
                Phylis J. Speedlin, Justice
                Steven C. Hilbig, Justice

Delivered and Filed:   October 28, 2009

AFFIRMED

In eight issues on appeal, Sepco Tubulars, Inc. and Padre Tubular, Inc. challenge the trial

court's amended judgment entered in favor of Jesse Ortega. We affirm the amended judgment of

the trial court.

**BRIEF BACKGROUND**

Jesse Ortega, a Halliburton Energy Services well hand, was injured when a burst pipe caused an oil well blowout. Ortega sued United Resources, L.P., the well operator, and Collinsworth Well Treating, Inc., the company responsible for pressure testing the well. Collinsworth and United named as a responsible third party the manufacturer of the pipe, Nizhnedneprosky Tube Rolling Plant ("NTRP"), whose operations are located in the Ukraine, and filed third party actions against Sepco Tubulars, Inc. and Padre Tubulars, Inc., the sellers/distributors of NTRP's pipe in the United States. Ortega subsequently amended his petition to name Sepco and Padre as defendants. The defendants cross-claimed against one another for contribution and also named Halliburton as a responsible third party.

The day of trial, Ortega non-suited Collinsworth. Collinsworth remained in the suit due to cross-claims alleged against it by its co-defendants. During the six-day jury trial, Ortega blamed Sepco and Padre for selling substandard pipe, which caused the blowout. Sepco and Padre did not call any witnesses at trial. Before the jury returned its verdict, United settled with Ortega. The jury found Sepco, Padre, and NTRP liable, and assessed responsibility between Sepco and Padre to be 75% and 25%, respectively. Ortega was awarded damages for past and future pain and suffering, past and future lost earnings, past and future physical impairment, and past and future medical expenses. The jury's verdict totaled $4 million.

Sepco and Padre (hereinafter, collectively referred to as "Sepco") filed a motion for JNOV; the trial court entered judgment on the verdict. Sepco then filed a motion for new trial and for remittitur. The trial court granted the motion for remittitur in part and entered an amended judgment, awarding approximately $2.6 million to Ortega. A second motion for new trial and a motion for further remittitur were also filed, but denied. Sepco now appeals from the final amended judgment.

**ANALYSIS**

On appeal, Sepco challenges the trial court's judgment on the following grounds: (1) counsel for Collinsworth made incurably harmful jury argument; (2) additional incurable jury argument was made with repeated violations of a motion in limine; (3) Collinsworth impermissibly skewed the presentation of the trial by aligning itself with the plaintiff; (4) the jury's negligence findings are not supported by legally or factually sufficient evidence; (5) the damages findings and awards are not supported by legally or factually sufficient evidence; (6) Sepco did not receive a spoliation instruction to which it was entitled; (7) judgment was erroneously entered against Sepco and Padre as manufacturers and sellers; and (8) the trial court abused its discretion in refusing to grant Sepco's motions for new trial.

## 1. *Incurable Jury Argument*

Sepco first argues that this case must be reversed and remanded due to incurable jury argument. Tor Vatne, the president of Sepco at the time of the blowout, testified that the exclusive mission of Sepco was to import and sell pipe from NTRP, a Ukrainian company. Vatne was questioned regarding the rejection rate of NTRP pipe. Pipe is "rejected" if it does not meet certain industry specifications. Vatne was not aware of a third-party inspection report stating that the pipe at issue had a rejection rate of 39 percent. Vatne estimated that an average rejection rate "from third world producers" is up to ten percent. During closing argument, counsel for Collinsworth argued to the jury:

> My client has no way of knowing what it is, even where that pipe came from. It was a complete surprise to us that the pipe is from the Ukraine. . . .

> * * *

Thirty-nine times out of 100, I'm going to make a serious mistake that could hurt or kill somebody. And then you pass that off as the manufacturer of a piece of pipe and you say: 'Well, pipe fails all the time.' This is Third World pipe!

* * *

Do you remember Mr. Vatne? Remember what he said about that? This is his own pipe that he sells and he called it "Third World," "Third World pipe."

* * *

So, think about that when you think about what a responsible manufacturer or seller of a piece of pipe should do. If 39 percent is the best you can do, you need to wrap up the plant and call it quits - - because we deserve better than that in the United States. We deserve better than that. . . .

* * *

We don't have any direct proof. We don't have anybody from the Ukraine over here with their little Russian coats and hats telling us what it was that they did. We don't even have any documents whether or not they properly tested this pipe. . . .

* * *

They [Sepco/Padre] will not accept any responsibility for that pipe and it becomes your responsibility as citizens of Brooks County to say: 'You know, we respectfully disagree with you guys, Sepco/Padre, whoever you all are, because it is your pipe and it is bad pipe and it is pipe that should not be run in the well.' All right? To do anything else - - and I don't think that you will - - but to do anything else, I suggest, is contrary to the evidence.

No objection was lodged to the above-quoted argument.

### Standard of Review and Applicable Cases

Generally, to obtain reversal on the basis of improper jury argument, an appellant must prove "(1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge." *Standard Fire Ins.*

*Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979); *see also* TEX. R. APP. P. 33.1. In rare instances, retraction of the argument or instruction from the court will not cure any probable harm or prejudice; in that case, the argument is incurable and complaint may be made even though objection was not timely made. *Living Centers of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam). To determine whether the harm emanating from an improper argument is incurable, the Texas Supreme Court has instructed that we must examine, "whether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict." *Peñalver*, 256 S.W.3d at 681 (citing *Tex. Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856, 858 (1954)). The court continued to explain that "jury argument that strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts is incurably harmful not only because of its harm to the litigants involved, but also because of its capacity to damage the judicial system. Such argument is not subject to the general harmless error analysis." *Peñalver*, 256 S.W.3d at 681.

In *Peñalver*, the Texas Supreme Court considered whether a jury argument made in a case involving the wrongful death of a ninety year-old nursing home resident was incurable. The jury argument in question compared defense counsel to perpetrators of Germany's World War II T-4 Project in which elderly and infirm persons were used for medical experimentation. *Id.* at 679-82. The court held that "[t]he argument struck at the integrity of the courts by utilizing an argument that was improper, unsupported, and uninvited." *Id.* at 682. The court noted that the failure to address such argument would cause the "entire judicial system" to suffer. *Id.*

The Texas Supreme Court has also examined whether a trial court abused its discretion in admitting a memo containing the phrase "illiterate Mexicans." *Coastal Oil & Gas Corp. v. Garza*

*Energy Trust,* 268 S.W.3d 1, 21-26 (Tex. 2008). Noting that the all-Hispanic jury was inflamed by the phrase—as evidenced by its excessive verdict—and that the memo was not relevant to the issues in the trial, the court held that admission of the memo amounted to harmful error requiring a new trial. *Id.* at 26.

Most recently, the Texas Supreme Court considered whether the following argument in a wrongful death action against a physician amounted to incurable jury argument: "For years, in this very conservative community, juries have been very liberal with the doctors, very liberal. What I mean is: Their verdicts didn't send much of a message at all." *Phillips v. Bramlett*, 288 S.W.3d 876, 882 (Tex. 2009). Defense counsel immediately objected and the trial court overruled the objection. *Id.* at 882-83. Counsel continued to argue without objection that the jury needed to send a message to the doctors of Lubbock. *Id.* at 883. On appeal, the court held that counsel's plea to send a message to the doctors was not an unsubstantiated attack on the integrity or veracity of a party or counsel, nor did it appeal to racial prejudice or the like; considering the entire record, the court stated the argument was not so extreme as to be incapable of cure. *Id.* The court emphasized that "[t]he party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Id.* (quoting *Goforth v. Alvey*, 153 Tex. 449, 271 S.W.2d 404, 404 (1954)).

This court has also examined the issue of incurable jury argument. In 1939, we reversed the trial court's judgment in a case where counsel stressed that the plaintiff was not an American citizen—unlike the defendant who was a "fellow citizen" who "pay[s] his taxes to the United States Government and obey[s] the laws of the United States Government"— and further stated, "I don't know whether he waded that river or swam. But . . . when you gentlemen bring in the verdict he will

swim that river again because. . . I think he is all wet in this law suit." *Basanez v. Union Bus Lines*, 132 S.W.2d 432, 432-33 (Tex. Civ. App.—San Antonio 1939, no writ). The court held that the argument was clearly inflammatory and prejudicial because it sought a verdict upon the premise that the appellant was not a citizen of the United States, as were the jury and the appellee. *Id.* at 433. "It tended to create a racial prejudice in the minds of the jury as between alien appellants and citizens, appellee and the jury." *Id.*

More recently, this court examined the issue of incurable jury argument in *Tex. Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859 (Tex. App.—San Antonio 1990, writ denied). In that case, a Hispanic man sued for injuries sustained in the course of his employment. Plaintiff's counsel, who was also Hispanic, argued to the mostly Hispanic jury that "[r]ight now is a time to be united" and "there comes a time when we have got to stick together as a community."[1] *Id.* at 862. This court held that the argument was an impermissible appeal to ethnic solidarity and remanded the cause for a new trial. *Id.* at 862-63, 868. In so doing, the court declared that "incurable reversible error occurs whenever any attorney suggests, either openly or with subtlety and finesse, that a jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity." *Id.* at 866. The court stressed, however, that its holding did not encompass *incidental* references to the race of the parties and witnesses. *Id.* at 867 (emphasis added).

---

[1] We noted that our decision did not rest on the actual ethnic heritage of the jurors, but on the fact that the attorney who made the intentional ethnic appeal thought it would have an impact on the jury. *Id*. at 867 n.9.

Two Texas cases specifically address jury argument involving Russians. In *Trachtenberg v. Castillo*, 257 S.W.657 (Tex. Civ. App.—El Paso 1923, writ dism'd w.o.j.),[2] appellee's counsel referred to the appellants as "these sweet-scented apple blossoms from Russia" and "these birds from Russia." *Id*. at 660. The court held that the remarks were objectionable and invoked race prejudice. *Id.* Based on its disposition of other issues, the court reversed the case and rendered judgment for the appellants. *Id.*

In *United States v. Saenz*, 747 F.2d 930 (5th Cir. 1984), the prosecutor likened the defense's attempt to blame the prosecution of abusing the system to the Russians' attempt to blame the Americans for the 1983 attack of a Korean airliner. *Id.* at 942-43. The Fifth Circuit noted that the remarks were improper and that the "unfortunate comparison cannot be condoned. . . ." *Id.* However, after weighing the degree to which the argument may have affected the substantial rights of the defendants, the court held that the rhetoric did not reach the level of reversible error when taken in context. *Id.*

### Discussion

Sepco contends that the remarks by Collinsworth's counsel were an appeal to prejudice on nationality grounds and that no objection was required because an instruction would not have cured the harm resulting from the prejudicial remarks. Sepco further argues that they were harmed by the argument because, despite overwhelming evidence that other parties were responsible for Ortega's injuries and Ortega's own request that the jury find United 33 1/3 % responsible, the jury found only NTRP, Sepco, and Padre liable. The jury then found that only Sepco and Padre should pay the $4

---

[2] Both Collinsworth and Ortega argue that the *Trachtenberg* opinion should not be relied upon to decide this case because precedents that arose prior to 1941 holding that jury argument was prejudicial are unreliable due to the 1941 adoption of the harmless error rule. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex. 1979).

million verdict to Ortega, a 29 year-old man who continued to work 90 hours a week after sustaining a back injury. Sepco argues that because the evidence does not support these findings, an "outside cause," *i.e.*, the "highly prejudicial jury argument," must be responsible.

In response, Collinsworth maintains that it did not overstep the bounds of proper advocacy by asserting that jurors should apply a domestic rather than a foreign standard of care. Additionally, all the parties throughout the trial, including Sepco, referred to the pipe as being "Ukrainian" or "from the Ukraine." Further, the argument was invited given that Sepco engaged in questioning about what the technicians at NTRP might have done in testing and certifying the pipe. Finally, Collinsworth avers that the "Russian coats and hats" statement was a stray remark which was not repeated during Collinsworth's closing argument after a six-day trial. Thus, the argument was not so harmful that it was incurable, and any improprieties were waived by Sepco's failure to object at trial.

Ortega also disagrees that the argument was improper. Given that the Ukrainian origin of the pipe was mentioned numerous times throughout the trial and that Vatne described NTRP as a "third world" producer, Ortega contends the argument was proper because it was based directly on the evidence. Additionally, Ortega argues that "we deserve better than that in the United States" was appropriate because it asked the jury to "send a message" to the defendants that this conduct will not be tolerated by the community. Ortega notes that an appeal to local prejudice or unity is usually considered a curable impropriety for which an objection is required. *See* 8 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 120C.04[3][i][iv] (2009). Accordingly, Ortega asserts the argument was proper, but even if improper, any harm would have been cured by an instruction.

Ortega categorizes the "Russian hats and coats" comment as acceptable "hyperbole" and further contends that this comment was said only once and was unlikely to persuade the jurors to

vote the way they did solely because of the comment. Ortega is confident that the comment had no prejudicial impact because the jury unanimously answered "0%" to the question asking the percentage of Ortega's injuries caused by NTRP.

Turning to the jury argument itself, we agree that some of counsel's remarks were objectionable. Although the references to "Ukraine" and "Third World pipe" were based on elicited trial testimony and would not, standing alone, be improper, those references become more troublesome when combined with later remarks such as "little Russian coats and hats" and "we deserve better than that in the United States." Clearly, our courts have held that it is improper to appeal to racial or ethnic prejudice. *See, e.g., Coastal Oil & Gas Corp.*, 286 S.W.3d at 26*; Peñalver*, 256 S.W.3d at 681; *Haywood,* 266 S.W.2d at 858; *Guerrero*, 800 S.W.2d at 868; *Basanez*, 132 S.W.2d at 433. Here, however, taking the argument as a whole, we cannot say the critical remarks were either unsupported by the evidence or more than incidental references to the nationality of the pipe manufacturer. Nor can we agree with Sepco's contention that the only explanation for the jury's findings and damage awards is an "outside cause," *i.e*., the jury argument. Although the reference to "little Russian coats and hats" was objectionable, we cannot conclude that based on the record as a whole, the argument here was so extreme that a "juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *See Phillips*, 288 S.W.3d at 883. Accordingly, Sepco's first issue is overruled.

## 2. *Limine Violations*

Sepco next argues that Collinsworth's counsel repeatedly violated the trial court's ruling on a pretrial motion in limine which precluded "[a]ny mention of or reference to Defendant's failure to call any witness equally available to any other party" unless "such witness is within the exclusive control of . . . the Defendant . . . ." Despite this, counsel for Collinsworth informed the jury of

Sepco's failure to call its expert witness, Dr. Wooley: "But we did not hear from one important person. Where was Dr. Wooley?" Sepco timely objected, stating that Collinsworth had Wooley's videotaped deposition and could have played it, and that the statements violated "the Motion in Limine." Collinsworth replied that Wooley was a retained expert under Sepco's control. The trial court overruled the objection. Collinsworth continued to make several more references to the "mysterious Dr. Wooley." After the conclusion of arguments and after the jury was given the charge, Sepco moved for a mistrial based on the violations of the motion in limine. The trial court denied the motion.

Ortega and Collinsworth initially respond that Sepco failed to preserve this issue for appeal because: (1) the trial court never signed an order or verbally ruled on the limine issues Sepco now complains of; (2) Sepco's complaints at trial do not comport with its complaints on appeal; and (3) Sepco's complaint at trial was not specific enough to advise the trial court of the alleged error. Assuming Sepco did preserve error, the motion in limine did not prevent Collinsworth from commenting on the fact that Sepco failed to call Dr. Wooley, a witness within its exclusive control. Counsel may comment on the failure of the opposing party to call a witness employed by said party. *First Interstate Bank of Bedford v. Bland,* 810 S.W.2d 277, 289 (Tex. App.—Fort Worth 1991, no writ) (citing *Tex-Jersey Oil Corp. v. Beck,* 157 Tex. 541, 548, 305 S.W.2d 162, 167 (1957), *overruled on other grounds, Sanchez v. Schindler,* 651 S.W.2d 249 (Tex. 1983)). "The right to comment on the failure to call and use an employee-witness does not grow out of the unavailability of the witness but out of his relationship with the opposite party." *Tex-Jersey Oil Corp.,* 305 S.W.2d at 167. Accordingly, the trial court correctly overruled the objection on this basis. Sepco's second issue is overruled.

### *3. Skewed Presentation of Trial*

In its third issue, Sepco argues that actions taken by Collinsworth during trial mandate a reversal and a remand for a new trial as a matter of law. According to Sepco, Collinsworth, who was non-suited by Ortega on the first day of trial, unexpectedly and unfairly distorted the trial process by aligning itself with Ortega to "argue for high damages." Sepco maintains Collinsworth's position at trial was illogical for a contribution defendant and, as evidence, points to several instances in the record where Collinsworth (1) acknowledged or supported Ortega's claims of injury, (2) did not join in the motion for directed verdict against Ortega, and (3) sought a separate line submission on Ortega's claim for future economic damages. Arguing that the public policy principles discussed in *Elbaor v. Smith,* 845 S.W.2d 240 (Tex. 1992), should apply here*,* Sepco maintains Collinsworth's unexpected actions skewed the alignment of the parties, confused the jury, thwarted Sepco's due process rights to a fair trial, and caused the rendition of an improper verdict. *See id.* at 249 (invalidating "Mary Carter" agreements[3] as void as against public policy).

Assuming without deciding that Sepco properly preserved this issue for appeal, Sepco's argument fails as unpersuasive for several reasons. First, Collinsworth's trial strategy is neither unexpected nor prohibited. Because Ortega non-suited Collinsworth on the day of trial, the only parties adverse to Collinsworth during trial were Sepco and Padre who were seeking contribution from Collinsworth in the event the jury held them liable for Ortega's injuries. Therefore, it is hardly unexpected that Collinsworth would distance itself from Sepco and Padre. Nor is it surprising that Collinsworth might seek to align itself with Ortega, an injured worker and family man, portraying him as someone injured through no fault of his own and "a good man" who did the "right thing" by

---

[3] "A Mary Carter agreement exists when the settling defendant retains a financial stake in the plaintiff's recovery *and* remains a party at the trial of the case." *Elbaor,* 845 S.W.2d at 249.

dropping claims against Collinsworth after realizing that Collinsworth was not at fault for the accident. As noted by Justice Hecht, "There is nothing wrong with one defendant siding with the plaintiff against another defendant; the one defendant may believe the other to be liable." *See Mallios v. Baker,* 11 S.W.3d 157, 160 (Tex. 2000) (Hecht, J., concurring).

Second, Sepco asks us to apply the same public policy principles discussed in *Elbaor v. Smith* and used to justify reversal in the Mary Carter settlement context. *See Elbaor,* 845 S.W.2d at 249 (Mary Carter agreements pressure "settling" defendant to alter the character of the suit in favor of the plaintiff and thus distort the case presented to the jury); *see also Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 8 (Tex. 1986) ("Mary Carter agreements should be prohibited because they are inimical to the adversary system, and they do not promote settlement—their primary justification."). Here, however, there is no evidence a Mary Carter agreement existed. Collinsworth was non-suited by Ortega and had no financial stake in the outcome of Ortega's suit against Sepco. Nor do we agree with Sepco's argument that the same policy principles used to justify reversal in a Mary Carter settlement context should apply when, as here, the defendant is non-suited by the plaintiff and then chooses a trial strategy that aligns itself with the plaintiff. Sepco relies on *St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc.,* 917 S.W.2d 29, 41-42 (Tex. App.—Amarillo 1995), *aff'd in part and rev'd in part,* 974 S.W.2d 51 (Tex. 1998). *St. Paul* is readily distinguishable, however, because it involved a settlement agreement that allowed the settling party to recoup a portion of its settlement if the plaintiff was successful against the non-settling defendants. *Id.* Therefore, in both *Elbaor* and *St. Paul* there existed a clear financial incentive for the defendant to align itself with the plaintiff that is simply not present here. As noted by Justice Hecht in *Mallios*: "[Mary Carter] agreements contravene public policy because they provide ulterior financial incentives for parties to take positions they would not otherwise take and thus unfairly

distort litigation." *Mallios,* 11 S.W.3d at 160 (Hecht, J., concurring). "There is nothing wrong with one defendant siding with the plaintiff against another defendant; the one defendant may believe the other to be liable. The vice is not in the unusual alignment of the parties, but in the financial incentives that encourage the alignment." *Id.* Based on the record before us, Collinsworth did not have a financial interest in the outcome of Ortega's suit against Sepco and Padre, and therefore, neither the holdings nor rationale of Mary Carter decisions apply.

Finally, even where a Mary Carter agreement exists, a complaining party must establish that the claimed error "was reasonably calculated to cause and probably did cause the rendition of an improper judgment." *Elbaor,* 845 S.W.2d at 251 n.23 (citing former TEX. R. APP. P. 81(b) & 184(b)); *see also St. Paul Surplus Lines Ins. Co.,* 917 S.W.2d at 44 (any error in introducing existence of Mary Carter agreement was harmless where settling defendant did not argue for higher damages, present witnesses, or otherwise vigorously point finger of liability at non-settling defendant); *Tex. Capital Sec., Inc. v. Sandefer,* 58 S.W.3d 760, 770 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (same). Although Sepco argues that Collinsworth confused the jury and caused the rendition of an improper verdict, the record does not reflect that the jury was misled. Accordingly, we overrule this issue on appeal.

### 4. *Legal and Factual Sufficiency of the Evidence to Support Finding of Negligence*

In its fourth issue, Sepco contends that there is no evidence, or factually insufficient evidence, to support the jury's finding that NTRP, Sepco, and Padre were the only negligent parties. When considering a legal sufficiency challenge, we review the evidence in the light most favorable to the verdict giving "credit [to] favorable evidence if reasonable jurors could, and disregard[ing] contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). We must determine "whether the evidence at trial would enable reasonable and fair-minded

people to reach the verdict under review." *Id.* Evidence is legally insufficient when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. When reviewing a factual sufficiency challenge, we consider all the evidence in the record and reverse only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

In applying these standards, we must be mindful that the jury is the sole judge of the witnesses' credibility and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. Jurors may choose to believe one witness and disbelieve another. *Id.* at 819-20. Most credibility questions are implicit rather than explicit in a jury's verdict. *Id.* at 819. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. *Id.* Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. *Id.* at 820; *see also Barrajas v. VIA Metropolitan Transit Auth.,* 945 S.W.2d 207, 209 (Tex. App.—San Antonio 1997, no writ) (jury may disbelieve witness even though his testimony is not contradicted).

### *Evidence at Trial*

On May 3, 2005, United was the well operator of Garcia No. 1 Well in Zapata County. United retained Collinsworth to conduct pressure testing on the well. Lauro Silvas, a Collinsworth employee, was responsible for testing the well at a level of 9,500 pounds per square inch (psi). As

Silvas prepared to test the well, Ortega, a Halliburton[4] well hand, drove a company truck onto the well site. Ortega was told to move away from the well and drove the Halliburton truck about 125 feet from the well. Suddenly, there was a blowout, or explosion, caused by a burst in a section of the pipe near the surface. The contents of the well—a combination of dehydrated or partially-dehydrated drilling fluids and mud, oil, brine water, fresh water, and sand—shot out of the valve at 9,500 psi and hit Ortega. He was blown from the back to the front of his truck, which is 40 feet long.

Ortega, complaining that he hurt all over, was taken to the nearest clinic in Zapata. From there, he was rushed to the hospital in Laredo. He was diagnosed with lower lumbar and cervical spine strains, multiple contusions, and a concussion. Throughout the summer of 2005, Ortega had pain in his back and both pain and numbness in his leg, and suffered from heachaches so intense he would vomit. Dr. Alejandro Lopez, the Halliburton doctor, referred Ortega to an orthopedic surgeon, Dr. John Masciale. Based upon a physical examination and an MRI, Masciale concluded that Ortega sustained a disc herniation compressing the nerve root at the L-4 spinal region. Masciale treated Ortega with a conservative approach, prescribing pain medications, corticosteroid injections, and physical therapy. In September 2005, Ortega returned to work at Halliburton after Masciale released him for light duty. Ortega explained that he was continually in pain, but had to go to work because he made a promise to support his family. Masciale did discuss with Ortega the option of changing to a less physically strenuous occupation, but Ortega did not have any other skill sets he could use to earn a living.

About a year later, Ortega underwent spinal surgery after realizing that the conservative treatment approach was not alleviating his pain, which was only getting worse. During the

---

[4] Halliburton was retained by United to perforate the well.

operation, Masciale visually confirmed that Ortega had a herniated disc impinging on the nerve root at the L-4. After the surgery, Ortega's pain initially worsened, and then lessened, but is still present. Ortega continues to require pain medications to work and to sleep. Ortega stated that he is not able to enjoy time with his family like he used to because of the persistent pain. Ortega returned to work in January 2007 in a less strenuous position but still works long hours. Masciale testified that if Ortega continues to work in manual labor, he will require a future surgery for recurrence of disc herniation.

Also discussed at trial was the cause of the blowout. After the blowout, United pulled the pipe and found a split in the tenth joint down-hole. United ordered API (American Petroleum Institute) P-110 certified pipe from Padre, which Padre ordered from Sepco. Metallurgical testing of the failed pipe conducted after the blowout, however, established that the pipe did not meet these requirements. United's expert concluded that the "root cause [of the blowout] was that the pipe was far below industry standards for the pipe that had been ordered." In addition, the pipe was not subjected to the testing required by the industry. A mill test report from NTRP did not indicate that any hydrostatic testing—a test to ensure that pipe will hold a specific amount of pressure—was performed.

On appeal, Sepco argues that because United, Collinsworth, and Halliburton were all at fault for allowing Ortega to be within the "zone of danger" at the time of the blowout, the evidence does not support the jury's findings that these parties bore no responsibility for Ortega's injuries. Additionally, Ortega himself, as an experienced well hand, should have known to place himself outside the zone of danger. Sepco urges us to reverse this judgment on the basis of factual insufficiency as we did in *Bay, Inc. v. Ramos*, 139 S.W.3d 322, 330-31 (Tex. App.—San Antonio

2004, pet. denied) (holding evidence was factually insufficient to support jury's finding that mother bore zero responsibility for eighteen-month-old child's injuries caused by deployment of air bag where mother, despite her knowledge that backseat was safest place for a young child, placed child in front passenger seat). We find *Bay* distinguishable from the instant facts. Here, there was not uncontroverted evidence that Ortega was contributorily negligent. Conversely, the jury had before it evidence that Ortega was located a reasonable distance away from the wellhead at the time of the blowout. Michael Smith, president of an oil and gas consulting firm, testified that a minimum of 100 feet from the well is considered safe in the industry. There was testimony that Ortega was standing between 120 and 125 feet from the well. Further, there was no evidence, as Sepco argues, that Ortega knew he was standing directly in the path of the out-flow valve when the pipe failed. Several witnesses testified that the entire 360-degree radius of the well is a danger zone during pressure testing because of the various things that can go wrong. As such, there was no completely safe place to stand during the test. This evidence was sufficient to support the jury's findings that Ortega, United, Collinsworth, and Halliburton were not negligent or that their negligence did not proximately cause the accident. Sepco's fourth issue is overruled.

### 5. *Sufficiency of the Evidence to Support Damages Findings and Damage Awards*

In its fifth issue, Sepco argues that the damages findings and judgment are contrary to the evidence presented at trial for five reasons. Before addressing each damage award in turn, we note that the jury generally has broad discretion to award damages within the range of evidence presented at trial. *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.) (citing *Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 566 (Tex. 2002)). A jury is entitled to disbelieve or discount any part of an expert's testimony, even though the basis of the jury's specific

calculation cannot be determined from the record. *See America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 629 (Tex. App.—San Antonio 1996, writ denied) (upholding jury's damages verdict where jury did not unquestioningly accept testimony of plaintiff's expert, but reduced the amount of damages presumably based on challenges made by defendant's expert to plaintiff's damages model); *see also State Farm Fire & Cas. Co. v. Rodriguez,* 88 S.W.3d 313, 321 (Tex. App.—San Antonio 2002, pet. denied), *abrogated on other grounds by Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 27 (Tex. 2008) (jury is free to blend the evidence and believe all, some, or none of a witness's testimony); *Barrajas,* 945 S.W.2d at 209 (jury may disbelieve an expert witness concerning damages even though his testimony is not contradicted).

### A. Due to Ortega's pre-existing injuries and conditions, there is no evidence that any act or omission on Sepco's part caused Ortega's alleged damages.

Sepco argues that all the damages findings should be reversed because Dr. Masciale based his conclusion that the blowout caused Ortega's injuries on his assumption that Ortega was symptom-free prior to the accident; Sepco contends Masciale's assumption was erroneous because Ortega sustained a back injury in 1997 and never reported it to Masciale. The 1997 injury, however, was an evulsion fracture of the L-5. As a result of the blowout at issue, Ortega sustained a disc herniation at the L-4; Masciale performed spinal surgery at the L-4. Ortega stated he did not complain about or seek treatment for back pain between 1998 and the date of the blowout in 2005. Sepco also alleges Ortega suffered from a congenital condition and arthritis. Masciale testified Ortega has a transitional segment at the L-5, not the L-4. The finding of arthritis was also discovered *after* the accident at the L-5. Thus, Sepco cannot demonstrate that a previous injury or condition is to blame for Ortega's damages.

### B. Future lost earning capacity.

The jury found Ortega should be awarded $577,950 for loss of future earning capacity; the trial court reduced the figure to $300,000. Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after the trial. *Tagle v. Galvan,* 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.). The jury has considerable discretion in determining the amount of this award. *Id.* To support an award of damages for loss of future earning capacity, the plaintiff can introduce evidence of past earnings; the plaintiff's stamina, efficiency, and ability to work with pain; the weaknesses and degenerative changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy. *Id.* Sepco maintains the evidence is insufficient to support any award because Ortega returned to his same job a few months after the accident and even received a pay raise. Although Ortega was working at the time of trial, the jury was entitled to consider the fact that his earning capacity may be diminished in the future due to another injury or surgery. *See id.* Ortega was 29 years-old at the time of trial, and Dr. Stephen Horner, an economist, testified that if Ortega were not able to work at all in the future, his lost earning capacity would total $1.2 million. Based on this testimony, the jury was free to determine what portion of Ortega's future wage earning capacity would be lost due to a future surgery or periods of convalescence. Given this testimony, we cannot conclude the award of $300,000 was clearly wrong or manifestly unjust.

### C. Past and future physical impairment.

The jury found Ortega should be awarded $577,950 for both past and future physical impairment; the trial court reduced the awards to $250,000 and $500,000, respectively. Physical impairment is defined as the loss of a person's former lifestyle, extending beyond pain, mental anguish, and earning capacity. *See Casas v. Paradez*, 267 S.W.3d 170, 188 (Tex. App.—San

Antonio 2008, pet. denied). Sepco contends Ortega has not suffered an injury distinct from and beyond pain, mental anguish, and diminished earning capacity, nor will he suffer the same in the future.

Ortega testified that although he still goes camping and takes trips with his family, it is not the same as it was before the accident. Because he is constantly in pain, he is easily irritated. He is now grumpier, sometimes less fun to be with, and less playful with his children. The injury also interfered with his romantic relationship with his wife. Physical impairment can include difficulty communicating with others, inability to sleep due to pain, and inability to play with children. *See Patlyek v. Brittain*, 149 S.W.3d 781, 787 (Tex. App.—Austin 2004, pet. denied). Thus, this evidence was sufficient to support the remitted awards.

### D. Past and future physical pain and mental anguish.

The jury found Ortega should be awarded $1,155,900 for past pain and mental anguish and $963,250.00 for future pain and mental anguish; the trial court reduced both figures to $750,000. The jury is given broad discretion in awarding amounts for pain and mental anguish because there are no objective guidelines by which we measure the monetary equivalent of pain and suffering resulting from physical injury. *Casas*, 267 S.W.3d at 185. With respect to pain and suffering, there was evidence that Ortega was knocked to the ground after being hit by debris-filled liquid propelled by a pressure of 9,500 psi. He hurt all over, and suffered a concussion and a disc herniation. Thereafter, Ortega experienced headaches so intense he often vomited. He also suffered from severe back and leg pain and numbness in his leg. He was constantly on prescription paid medication so that he could function and sleep. Masciale described Ortega's pain as "chronic," meaning he was never pain-free. Due to the worsening pain, Ortega underwent spinal surgery. Although the pain

was lessened by the surgery, it is still present. If Ortega continues to work, which he stated he plans to do in order to support his family, he will require another spinal surgery in the future. Therefore, the record contains sufficient evidence of pain and suffering.

With respect to mental anguish, Oretga presented evidence of a substantial disruption in his daily routine. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Even though he continued to work and engage in activities with his family, as Sepco points out, he did not "actively" engage in the same activities. He was worried about providing for his family, he was easily irritated due to the constant state of pain he lived in, and he was always wondering whether a certain activity would hurt his back. Therefore, the post-remitted award is supported by sufficient evidence that Ortega suffered, and would suffer in the future, mental anguish.

### E. Future medical expenses.

Finally, the jury found that Ortega should be awarded $50,000 for future medical expenses. The trial court did not remit this amount. Dr. Masciale testified that Ortega's future medical costs could exceed $100,000. He calculated $300-$500 per year for office visits; a couple thousand dollars per year for prescription medications; $5,000 per injection treatment; $1,000 per MRI; and over $10,000 for a fusion operation which Ortega will "more likely than not" need if he continues to work as a manual laborer. Ortega testified he will continue to work at Halliburton to support his family.

Sepco maintains that Masciale's testimony that Ortega may need a future operation is too speculative to support the award of $50,000 for future medical expenses. *See Bill Miller Bar-B-Q Enters., Ltd. v. Gonzales,* No. 04-04-00747-CV, 2005 WL 2176079, at *3 n.4 (Tex. App.—San Antonio Aug. 24, 2005, pet. denied) (reducing award for future medical expenses where there was

no evidence claimant would, in reasonable probability, require surgery). Even putting aside the $10,000 surgery cost, however, there was sufficient evidence to support the award for future medical expenses based on Masciale's testimony that the cost of future office visits, treatments, MRIs, and medication would exceed $100,000.

In conclusion, the evidence before the jury was sufficient to support the damages findings and damage awards. Accordingly, Sepco's fifth issue is overruled.

**6.     *Judgment Cannot be Entered Against Sepco and Padre as Manufacturers or Sellers***

Ortega alleged Sepco and Padre were strictly liable under a manufacturer/seller theory pursuant to section 82.003(a)(5)(C) of the Texas Civil Practice and Remedies Code, which provides that a seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves that the claimant relied on the representation in obtaining or using the product. TEX. CIV. PRAC. & REM. CODE ANN. § 82.003(a)(5)(C) (Vernon 2005). Section 82.003(a)(5)(C) does not apply, however, to the instant situation because the parties stipulated that NTRP is not subject to the jurisdiction of the Texas courts. *See id.* § 82.003(a)(7)(B) ("seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves . . . that the manufacturer of the product is . . . not subject to the jurisdiction of the court"). Accordingly, we overrule Sepco's sixth issue.

**7.     *Spoliation Instruction***

Sepco's seventh issue raises spoliation of evidence. Spoliation is the improper destruction of evidence, proof of which may give rise to a presumption that the missing evidence would be unfavorable to the spoliator. *Walker v. Thomasson Lumber Co.*, 203 S.W.3d 470, 477 (Tex. App.—Houston [14th Dist.] 2006, no pet.). To raise the spoliation issue, the party seeking the

presumption bears the burden of establishing that the alleged spoliator had a duty to preserve the evidence in question. *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003). This duty to preserve evidence arises when a party knows or reasonably should know that (1) there is a substantial chance that a claim will be filed and (2) evidence in its possession or control will be material and relevant to that claim. *Id.* We review a ruling on a spoliation instruction under an abuse of discretion standard. *Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 479 (Tex. App.—San Antonio 2001, pet. denied).

After the blowout, United pulled the pipe from the well and sent it for metallurgical analysis; Sepco alleges the pipe was subsequently destroyed while in United's possession and/or control. Accordingly, Sepco maintains it was entitled to a spoliation instruction because the pipe was crucial to the case, and it was unable to present its third-party claims against United and its defenses to Ortega's claims. Further, Sepco contends the trial court's refusal to include the instruction probably resulted in the rendition of an improper verdict.

Ortega and Collinsworth reply that the trial court was under no duty to give a spoliation instruction because the pipe at issue was not destroyed; in fact, it was available for inspection and testing for over two years before trial, but Sepco never asked to see it. Collinsworth adds that although a small portion of the pipe was destroyed during testing—and that metallurgical testing is inherently destructive—Sepco does not attempt to show how it was prejudiced by not being able to examine or test those particular portions of the pipe. We agree there was no evidence that United destroyed the pipe with fraudulent purpose or intent. *See Johnson*, 106 S.W.3d at 722; *Crescendo*, 61 S.W.3d at 479. Accordingly, the trial court did not abuse its discretion in denying the proposed instruction.

**8.** *Motions for New Trial*

Finally, Sepco contends the trial court abused its discretion in denying Sepco's motions for new trial because the many serious errors that occurred during trial prejudiced and harmed Sepco and resulted in the rendition of an improper verdict and judgment. *See Norton v. Martinez*, 935 S.W.2d 898, 901 (Tex. App.—San Antonio 1996, no writ) (denial of motion for new trial is reviewed for abuse of discretion). In particular, Sepco stresses that the improper "Russians in their little coats and hats" argument resulted in a verdict against "the Russians" only, despite Ortega's request that the jury find United 33 1/3% responsible. In addition, Sepco alleges it was entitled to a new trial because the jury required a calculator to arrive at its award which "magically" added up to $4 million. Sepco maintains the remitted award is also unjust.

Although this court has recognized the "cumulative-error doctrine," it does not apply in this case because there was no error by the trial court with respect to the previous issues asserted by Sepco. *Saenz v. Martinez*, No. 04-07-00339- CV, 2008 WL 4809217, at *10 (Tex. App.—San Antonio Nov. 5, 2008, no pet.); *see Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.,* 131 S.W.3d 113, 124 (Tex. App.—San Antonio 2004), *aff'd,* 159 S.W.3d 87 (Tex. 2005). Accordingly, we overrule this last issue.

### Conclusion

The trial court's amended judgment is affirmed.


Phylis J. Speedlin, Justice